UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. BORREGO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| RUCKUS WIRELESS, INC., GEORGES ANTOUN, BARTON BURSTEIN, GAURAV GARG, STEWART GRIERSON, MOHAN GYANI, RICHARD LYNCH, and SELINA Y. LO, | ) ) ) ) ) | **FOR VIOLATIONS OF SECTIONS 14(d)4, 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| Defendants. | ) ) ) | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Robert D. Borrego ("Plaintiff"), on behalf of himself and all others similarly situated, by his attorneys, alleges the following upon information and belief, except as to those allegations specifically pertaining to Plaintiff and his counsel, which are made on personal knowledge, based on the investigation conducted by Plaintiff's counsel. That investigation included reviewing and analyzing information concerning the proposed acquisition of all the outstanding stock of Ruckus Wireless, Inc. ("Ruckus" or the "Company") by Brocade Communications Systems, Inc. ("Brocade"), which Plaintiff (through his counsel) obtained from, among other sources: (i) publicly available press releases, news articles, and other media reports concerning Ruckus and/or Brocade; and (ii) publicly available information concerning Ruckus and/or Brocade that has been filed with the U.S. Securities and Exchange Commission ("SEC").

## NATURE OF THE CASE

1.     This is a stockholder class action on behalf of the holders of the common stock of Ruckus, against Ruckus and the members of Ruckus' board of directors (the "Individual

Defendants" or "Board") for violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.SC. §§ 78n(d)(4),78n(e), 78t(a), and SEC Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9").

2.      On April 3, 2016, Ruckus and Brocade announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which the Company's stockholders will receive $6.45 in cash and 0.75 of Brocade stock per Company share (the "Merger Consideration") pursuant to an exchange offer (the "Tender Offer")(the Tender Offer and the subsequent Merger are collectively referred to as the "Proposed Transaction").  The Defendants (defined below) announced that the total per share value of the Proposed Transaction was $14.43, reflecting a stock price for Brocade stock of $10.64 per share. The total value of the Proposed Transaction is approximately $1.2 billion.

3.      Defendants have violated the above-referenced sections of the Exchange Act, and rules and regulations promulgated by the SEC, by causing a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement ("14d-9") to be filed with the SEC on April 29, 2016.  The 14D-9 recommends that Ruckus stockholders tender their shares pursuant to the terms of the Merger Agreement based among other things on the opinion rendered by Ruckus' financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") and other internal and external factors the Ruckus Board purportedly considered.

4.      The Merger Consideration and the process by which Defendants have agreed to consummate the Proposed Transaction are fundamentally unfair to Ruckus' public stockholders. The Company has consistently announced positive financial results, most recently issuing revenue guidance for the first quarter 2016 of  between $98 and 101 million, which will

represent a nearly 20% increase year-over-year.[1]  At least one analyst set a target price of $15.00, nearly 15% higher than the current implied per share value (based on the Brocade's current stock price).  Thus, the Merger Consideration is inadequate and does not reflect the value of the Company or the fair value of Ruckus stock.

5.      The Merger Consideration is particularly inadequate given the significant benefits Brocade admits it will obtain from the Proposed Transaction.  The press release announcing the Proposed Transaction expressly provided that the acquisition is expected to be accretive to Brocade's non-GAAP earnings by the first quarter of 2017. Brocade's Chief Executive Officer ("CEO") and board member, Lloyd Carney stated on a conference call discussing the Proposed Transaction that the acquisition of Ruckus will "accelerate our growth…."[2]

6.      The inadequate Merger Consideration appears to be the result of a sale process that was motivated by the self-interest of certain Ruckus insiders who may cash out illiquid equity holdings and other large stockholders eager to reap immediate, if inadequate, benefits.  As Ruckus discloses,  directors, executive officers and certain stockholders who own greater than 5% of the Company's outstanding common stock and their affiliates, in the aggregate, beneficially own  approximately 11.8% of the outstanding shares of Ruckus common stock as of December 31, 2015 and therefore can influence the approval of the Merger.[3]  Indeed, the Individual Defendant, Selina Y. Lo, Ruckus' CEO and board member, has already agreed to tender all of her shares within ten (10) days of the commencement of the Tender Offer.

7.      The Board agreed to lock up the Proposed Transaction with Brocade by agreeing to deal protective devices that preclude other bidders from making a successful competing offer

---

[1] Ruckus Press Release,
www.sec.gov/Archives/edgar/data/1294016/000119312516529611/d170448dex991.htm.
[2] www.sec.gov/Archives/edgar/data/1009626/000119312516530949/d174969d425.htm.
[3] www.sec.gov/Archives/edgar/data/1294016/000129401616000049/ruckus-1231201510xk.htm.

for the Company.  Specifically, in Section 8.2 of the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision mandating that the Company must inform Brocade before taking action on any superior proposal from another potential acquirer, and requiring that the Board provide all information relating to the superior proposal (including the terms and identity of the suitor), (iii) a provision that requires the Board to negotiate with Brocade so that it may match any competing and/or superior proposal, and  (iv) a provision that requires Ruckus to pay Brocade a termination fee of $50 million.

8.     Further, certain Company officers and/or Board members on information and belief will keep their lucrative management positions after the Proposed Transaction closes, and certain of these officers and/or Board members may have been involved in the strategic review process and present at various Board meetings during which the Company's strategic alternatives, including the Proposed Transaction, were discussed, and thus undoubtedly influenced the Board's decision making process.

9.     To facilitate and aid the Individual Defendants with their breaches, Brocade announced it had increased the authorization to repurchase its common stock under its existing stock repurchase program to facilitate the repurchase of all shares issued in conjunction with the Ruckus acquisition.

10.     In pursuing the plan to facilitate Brocade's acquisition of Ruckus for grossly inadequate consideration, through a flawed process, the Defendants have asked Ruckus' stockholders to tender their shares for the inadequate consideration based upon the materially incomplete and misleading representations and information contained in the 14D-9, in violation

of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act.  Specifically, the 14D-9 contains materially incomplete and misleading information concerning: (i) the background of the Proposed Transaction; (ii) the Company's internal financial data forecasts; and (iii) the financial analyses of the Proposed Transaction performed by the financial advisors involved, including Morgan Stanley.

11.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Tender Offer and Proposed Transaction, or in the event the Tender Offer and Proposed Transaction are consummated, to recover damages resulting from the Individual Defendants' violations of their fiduciary duties owed to Ruckus' stockholders.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 14(d),14(e), and 20(a) of the Exchange Act, 15 U.S.C. §78n.  The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

13.     This Court has personal jurisdiction over all of the Defendants because each is either a corporation organized under the laws of this jurisdiction or  conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper under Section 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. §1391, because Ruckus is incorporated in and each Defendant transacted business in this District.

## PARTIES

15.     Plaintiff is, and at all relevant times has been, a stockholder of Ruckus since prior to the wrongs complained of herein.

16.     Defendant Ruckus is incorporated under the laws Delaware and maintains its principle executive offices in Sunnyvale, California.  The Company was formed in 2004 and is a wireless technology company. Ruckus describes itself as a global supplier of carrier-class, "Smart Wi-Fi" products and technologies. Ruckus competes in the global market for mobile Internet infrastructure and enterprise wireless LAN systems. The company is credited with developing the industry's first adaptive Wi-Fi technology for carriers. Ruckus trades on the New York Stock Exchange under the symbol "RKUS."

17.     Individual Defendant Georges Antoun has served as a member of the Board since December 2011.  From July 2011 to June 2012, Antoun was a Venture Partner at Technology Crossover Partners and part of the Infrastructure team.

18.     Individual Defendant Barton Burstein has served as a member of the Board since November 2015.  Burstein was previously Senior Vice President of Strategy & Business Development at Ruckus, and he has worked with the Company since 2004. From 2003 to 2004, Mr. Burstein was an Entrepreneur in Residence at Sutter Hill Ventures.

19.     Individual Defendant Gaurav Garg has served as a member of the Board since August 2002.  From 2001 to 2010, Mr. Garg was a non-managing member at Sequoia Capital.

20.     Individual Defendant Stewart Grierson has served as a member of the Board since June 2012.

21.     Individual Defendant Mohan Gyani has served as a member of the Board since December 2009.

22.     Individual Defendant Richard Lynch has served as a member of the Board since March 2012.   Lynch has been president of FB Associates, LLC, an advisory and consulting services company, since September 2011.

23.     Individual Defendant Selina Y. Lo has served as a member of the Board since May 2004. Lo has served as President and Chief Executive Officer ("CEO") of the Company since July 2004.

24.     The individual board member Defendants are referred to as the "Individual Defendants."

25.     Non-party Brocade Communications Systems, Inc. is a Delaware technology corporation that specializes in data and storage networking products.   The Company is headquartered in San Jose, California and its stock trades under the symbol BRCD on the Nasdaq exchange.

26.     Non-party Stallion Merger Sub, Inc. ("Merger Sub") is a Delaware corporation and wholly-owned subsidiary of Brocade formed to effectuate the Merger. After consummation of the Proposed Transaction, Merger Sub will merge with and into Ruckus pursuant to Section 251(h) of the Delaware General Corporation Law, with Ruckus surviving as a wholly-owned subsidiary of Brocade.

27.     The Defendants referenced in the preceding paragraphs 16-24 are collectively referred to as the "Defendants."

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the other public stockholders of Ruckus who are being and will be harmed by Defendants' actions described herein (the "Class").   The Class

specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

29.     This action is properly maintainable as a class action.

30.     The Class is so numerous that joinder of all members is impracticable.  As of February 17, 2016, there were 89,722,741 million shares of Ruckus common stock outstanding, owned by numerous stockholders dispersed throughout the United States.

31.     Questions of law and fact exist that are common to the Class, including, among others:

(a)     whether the Defendants have violated Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and

(b)     whether Plaintiff and the other members of the Class would be irreparably harmed if the Proposed Transaction complained of herein is consummated as currently contemplated.

32.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

33.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially

impair or impede their ability to protect their interests.    A class action is superior to other available methods for fairly and effectively adjudicating the controversy.

34.    Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

35.    According to Ruckus' SEC filings, the Company is a "global supplier of advanced Wi-Fi solutions. Our solutions, which we call Smart Wi-Fi, are used by service providers and enterprises to solve a range of network capacity, coverage and reliability challenges associated with increasing wireless traffic demands created by the growth in the number of users equipped with more powerful smart wireless devices using increasingly data rich applications and services. We market and sell our products and technology directly and indirectly through a vast network of channel partners to a variety of service providers and enterprises around the world. Our Smart Wi-Fi solutions offer features and functionality such as enhanced reliability, consistent performance, extended range and massive scalability. Our products include high capacity controllers, indoor and outdoor access points, wireless bridges, controller software platforms, software management solutions including reporting and analytics and unique Wi-Fi-related cloud services, such as location-based positioning, and certificate-based security and on-boarding of Wi-Fi devices. These hardware and software products and services incorporate various elements of our proprietary technologies, including Smart Radio, SmartCast, SmartMesh and Smart

Scaling, to enable high performance in a variety of challenging operating environments."[4]

36.     Its technology includes Smart Wi-Fi technologies, which include: (i) **Smart Radio** - Our Smart Radio is a set of advanced hardware and software capabilities that automatically adjust Wi-Fi signals to constantly changing environmental conditions. This adaptability results in greater wireless coverage, reliability and higher levels of system performance, all without any manual tuning. A primary component of Smart Radio technology is BeamFlex, a patented smart antenna system that makes Wi-Fi signals stronger by focusing radio frequency energy where it is needed while dynamically adjusting signals in directions that yield the highest possible throughput for each receiving device. An extension of BeamFlex, known as BeamFlex+, automatically adapts Wi-Fi signals to the changing orientation of handheld devices through the use of polarization diversity with maximal radio combining. This enables Ruckus Smart Wi-Fi access points with BeamFlex+ to provide better reception for hard to hear clients and more consistent performance as clients constantly change orientation. Another component to the Smart Radio technology is ChannelFly, a performance optimization capability that automatically determines which radio frequencies or channels will deliver the greatest network throughput based on actual observed capacity, a key benefit for high-density, noisy Wi-Fi environments. ChannelFly is a different approach to dynamic and predictive capacity management that optimizes radio frequency ("RF") channel selection using capacity averages across all channels. Specialized algorithms select the best channel based on historical values. Traffic loads are assessed across all available channels to determine which RF channels will yield the highest throughput at any given time; (ii) **SmartCast** - our SmartCast, which we also call Smart QoS, is

---

[4] Capitalized terms, if not otherwise defined in this Complaint, have the meaning assigned in the 14D-9 and other SEC filings by Ruckus and/or Brocade, which filings are incorporated by reference and relied on herein.

a sophisticated software quality of service technology that manages traffic load to enhance the user experience. SmartCast was developed to handle the increasing volumes of latency-sensitive multimedia traffic such as voice over IP and streaming IP-based video traffic. SmartCast automatically prioritizes different traffic types through intelligent heuristics that classify, prioritize and schedule traffic for transmission over our advanced antenna arrays. SmartCast employs advanced queuing techniques and dedicated software queues on a per device basis to ensure fairness and optimize overall system performance. SmartCast also includes advanced Wi-Fi techniques such as band steering, rate limiting, client load balancing and airtime fairness, all of which operate automatically and transparently to our end customers and their users; (iii) *SmartMesh* -   Our SmartMesh is software technology that uses advanced self-organizing network principles to create highly resilient, high-speed Wi-Fi backbone links between Ruckus Smart Wi-Fi access points. SmartMesh simplifies the deployment of both service provider and enterprise wireless networks by reducing cumbersome radio planning and costly cabling needed to reliably connect every Wi-Fi access point. SmartMesh automatically establishes wireless connections between individual access points using patented smart antenna technology and self-heals in the event of a failed link. SmartMesh gives service providers the ability to lower capital expenditures typically associated with traditional fixed-line backhaul, providing flexibility to deploy infrastructure assets where needed with the assurance that both cellular and Wi-Fi traffic can be reliably and cost effectively backhauled; and (iv) *Smart Scaling* - Our Smart Scaling uses advanced highly scalable database management techniques to enable the support of hundreds of thousands of client devices across the Wi-Fi network. Smart Scaling employs intelligent data distribution techniques to extend client information, statistics and other vital user information across any number of nodes within the system without a single point of failure and with linear

scalability. Smart Scaling is incorporated in our purpose-built hardware and software, making it capable of supporting hundreds of thousands of access points and user session workloads at the scale required by service providers.

37.     Ruckus Wi-Fi solutions are marketed under the SmartZone, ZoneDirector (ZoneDirector is a family of Smart Wi-Fi controllers that streamline the configuration and management of Ruckus Smart Wi-Fi access points), ZoneFlex (includes a full range of indoor and outdoor access points and long range point-to-point and point-to-multipoint bridges. ZoneFlex APs work directly with our ZoneDirector, SZ, and vSZ management platforms), Unleashed (controllerless indoor Smart Wi-Fi access points custom-designed to help small business owners use Wi-Fi networks to grow their business, deliver an excellent customer experience and manage costs while supporting a variety of mobile devices with minimal information technology ("IT") staff) and Xclaim (a line of low-cost, controllerless Wi-Fi products targeted for small businesses that have little to no IT expertise in-house) brands. Additionally, Ruckus' software and service offerings are currently marketed under the virtual SmartZone ("vSZ")( a unique line of carrier-grade wireless access and management products that include specialized hardware products such as SmartZone ("SZ") controllers, as well as software solutions such as vSZ and virtual SmartZone Data Plane), Cloudpath (bridges the gap between enterprise-grade security and personal devices to create a Set-It-And-Forget-It Wi-Fi device on-boarding experience that allows "bring your own device" and IT-owned devices to be on-boarded in a scalable, secure, and user-friendly manner), Smart Positioning Technology ("SPoT") and SmartCell Insight ("SCI")( big data Wi-Fi analytics and reporting platform that helps enterprises and service providers greatly enhance, optimize and scale the performance of their wireless networks and services) product names. Under these brand and product names, we offer a full

range of indoor and outdoor access points ("APs"), wireless local area network ("WLAN")

controllers, network management software, Wi-Fi-related applications and cloud, or software-

based, services.

**B.**      **Summary of the Proposed Transaction**

38.      On April 3, 2016, Ruckus and Brocade issued a press release announcing the

Proposed Transaction, which provides in relevant part:

### Brocade to Acquire Ruckus Wireless to Build a Networking Company for the Digital Transformation Era

*Enhances Brocade's position as a pure-play networking company, addressing critical networking requirements from the data center to the wireless network edge*

- Combined company expected to be #1 in storage area networking, #1 in service provider Wi-Fi, #2 in data center networking, #3 in wireless LAN, and #3 in enterprise edge networking in the U.S. and EMEA

- Transaction expected to be accretive to Brocade's non-GAAP earnings by Q1 FY17
- Brocade increases stock repurchase authorization by $800 million

**SAN JOSE, Calif.—April 4, 2016—**Brocade (NASDAQ: BRCD) and Ruckus Wireless (NYSE: RKUS) today announced that Brocade has entered into a definitive agreement to acquire Ruckus Wireless, Inc. in a cash and stock transaction. The acquisition will complement Brocade's enterprise networking portfolio, adding Ruckus' higher-growth, wireless products to Brocade's market-leading networking solutions. It will also significantly strengthen Brocade's strategic presence in the broader service provider space, with Ruckus' market-leading Wi-Fi position. Brocade expects the transaction to be accretive to its non-GAAP earnings by its first quarter of fiscal 2017. The Ruckus organization will be led by current Ruckus CEO, Selina Lo, and report directly to Brocade CEO, Lloyd Carney.

Under the terms of the agreement, Ruckus stockholders will receive $6.45 in cash and 0.75 shares of Brocade common stock for each share of Ruckus common stock. Based on the closing price of Brocade's stock on April 1, 2016, the transaction values Ruckus at a price of $14.43 per common share, or approximately $1.5 billion, and may fluctuate until close. Net of estimated cash acquired, the transaction value is approximately $1.2 billion. The cash portion of the purchase price will be funded through a combination of cash on hand and new bank term loan financing.

As companies move to digitize their business, they need an underlying network architecture that supports business agility. This New IP architecture enables the network to become a platform for innovation and for developing, delivering, and securing new applications. Wireless is a critical access technology and the combination of Brocade and Ruckus creates a new type of pure-play networking company, with solutions spanning from the heart of the data center to the wireless network edge. In addition, after close, the acquisition is expected to accelerate cross-selling activities into the respective companies' partner and customer bases, opening up new revenue opportunities for the combined company across a variety of verticals, including large enterprises, K-12 and higher education, government, hospitality, and service providers.

Further, the acquisition will strengthen Brocade's ability to pursue emerging market opportunities around 5G mobile services, Internet of Things (IoT), Smart Cities, OpenG$^{tm}$ technology for in-building wireless, and LTE/Wi-Fi convergence. Brocade and Ruckus believe that the integration of Wi-Fi and the use of shared access or lightly licensed spectrum are critical to meeting the ever-growing demand for coverage, capacity, and consistency required for next-generation mobile services. These elements are important in Brocade's strategy to disrupt and enhance the way edge services are created and delivered.

"This strategic combination will position us to expand our addressable market and technology leadership with Ruckus' fast-growing wireless LAN products, and supports our vision to deliver market-leading New IP solutions that enable the network to become a platform for innovation," said Lloyd Carney, chief executive officer of Brocade. "History shows that focused, pure-play companies often innovate faster, are more agile, and deliver better value to their customers. With the rapidly evolving requirements of the digital transformation era, we are positioning ourselves to lead where technology is headed. We believe that combining our portfolios will provide significant benefits to our customers and will enable us to accelerate our growth and value creation."

"The combination of our two companies will create an exciting new thought leader in networking and significant opportunities for our stakeholders to participate in the combined company's future growth potential," said Selina Lo, president and CEO of Ruckus. "We operate in adjacent segments of the larger networking market with a number of common customers for our complementary

products, and have a successful track record of working together. We are excited for the opportunity to join the Brocade team and to jointly deliver innovative, value-added solutions to our enterprise and service provider customers."

The acquisition will be conducted by means of an exchange offer for all of the outstanding shares of Ruckus. The completion of the exchange offer is subject to customary conditions, including reviews by U.S. and international antitrust regulators and the tender of a majority of the outstanding shares of Ruckus' common stock. The companies expect the transaction, which has been approved by both companies' boards of directors, to close in Brocade's third fiscal quarter of 2016.

39.     The process that led to this announced Proposed Transaction was flawed from the beginning and the description of the process contained in the 14D-9 is false and/or misleading.

40.     As described in the 14D-9, the Individual Defendant Lo has worked with in the past and known Lloyd Carney ("Carney") CEO of Brocade, for many years.  On April 28, 2015, Ruckus and Brocade agreed to a non-exclusive informal commercial relationship regarding "open systems" for wired and wireless networking using products from both companies. The informal arrangement involved Brocade and Ruckus engaging in joint bids in the K-12 space. 14D-9, p. 14.

41.     On August 5, 2015, Carney contacted Lo about a potential strategic transaction between the two companies.  On August 7, 2015, the Board held a special meeting to discuss this outreach and instructed management to prepare a detailed analysis of the Company's business and financial expectations for the following eight quarters in preparation to engage in negotiations with Brocade. On August 18, 2015, Lo purportedly informed Carney that the Board believed the Company, which at that time was trading over $12.20 per share, to be undervalued. Lo further stated that the Company had been investing in a market opportunity that they would unveil in early 2016, that she believed

would expand its total addressable market and that may boost the Company's market price. Carney responded that Brocade would be willing to pay an attractive premium for the Company, particularly if he better understood the market expansion opportunities, and requested that Brocade be permitted to engage in due diligence. 14D-9, p. 14-15.

42.     On August 20, 2015, the Board met with Ruckus senior management to discuss Brocade's request for due diligence and which financial metrics to provide to Brocade, or other potential bidders, to establish the "true value" of the Company. At this meeting, the Board authorized the Company to provide Brocade with a high level overview of the Company's "product roadmap." 14D-9, p. 15.

43.     On August 28, 2015, the parties entered into a standard "Ruckus Ecosystem Partner Program Agreement" to formalize the previous informal engagement agreed to in the Spring in joint marketing and selling opportunities. Shortly thereafter, Brocade announced its open mobility solutions program, which consisted of strategic partnerships with wireless companies, including Ruckus.  14D-9, p. 15.

44.     On October 5, 2015, members of Company management, including Lo and Ruckus' Chief Financial Officer ("CFO") Seamus Hennessy, the Chief Operating Officer ("COO") Dan Rabinovitsj, Steve Martin, Senior Vice President and General Manager of Emerging Technologies, and the Individual Defendant Bart Burstein, a member of the Board, met with Brocade management members to discuss the Company's product roadmap. 14D-9, p. 15.  Later, on November 17, 2015, Carney told Lo that Brocade would need additional due diligence in order to submit a proposal and provided a due diligence list on November 20, 2015. *Id.* This list was updated on December 1, 2015. 14D-9, p. 16.  Company management worked to respond to this due diligence list

in December 2015 and January 2016. *Id.* The formal response to the additional due diligence was presented on January 15, 2016, which included the Company's financial projections. 14D-9, p. 17.

45.   At a November 4, 2015, Board meeting, management presented preliminary long-term forecasts for the Company.

46.   On November 5, 2015, Rabinovitsj and the Individual Defendant Gaurav Garg met with the Chief Technology Officer of Party A, with which Ruckus has an existing OEM reseller contract, to discuss potential acquisition of the Company. 14D-9, p. 15.

47.   On November 9, 2015, Lo met with the CEO of Party B, a long time business partner of the Company, to discuss among other things Party B's acquisition of Ruckus. 14D-9, p. 15.

48.   On November 23, 2015, the Board met to discuss the efforts to sell the Company, including Lo's meetings with potential financial advisors regarding among other things potential purchasers of the Company and potential stand-alone alternatives for the Company. The Board also discussed private equity funds that would be interested in acquiring the Company. The Board formed a Committee to work with Company management to retain a financial advisor and agreed to provide more due diligence to Brocade, including the forecasts prepared by management and presented a the November 4, 2015 Board meeting.  14D-9, p. 15-16.  The Committee eventually agreed to retain Morgan Stanley as financial advisor to the Company and Board regarding a sale of the Company. *Id.*

49.     On December 10, 2015, Ruckus provided Party A with the Company's financial projections. Morgan Stanley then followed up with Party A. 14D-9, p. 16.

50.     The Ruckus Board reached out to certain private equity firms in December 2015 regarding a possible strategic acquisition. 14D-9, p. 16.

51.     On December 23, 2015, Ruckus reached out to Party C regarding a strategic transaction with the Company, and followed up on January 4, 2016. 14D-9, p. 16. On January 22, 2016, Ruckus and Party C entered into a confidentiality agreement, which included a one-year stand-still provision. 14D-9, p. 17.

52.     On January 27, 2016, the Company received a written non-binding proposal from Brocade to acquire the Company for $6.00 in cash and 0.75 of a share of Brocade Common Stock per Share (the "January 27th Proposal"), implying a total value of approximately $12.00 per Share based on the closing price of Brocade Common Stock on January 26, 2016. The January 27th Proposal expired on February 5, 2016 and contemplated a 30-day exclusivity period that automatically extended for unlimited successive one-week periods as long as Ruckus and Brocade were negotiating in good faith towards a definitive agreement.   14D-9, p. 17.

53.     Morgan Stanley then on January 29, 2016, reached out to Party D regarding a potential strategic acquisition of the Company.  14D-9, p. 17.

54.     At the February 1, 2016 Board meeting, the Board again reviewed the Company's forecasts that had been presented to Brocade and Party A. The Board approved the FY 2016 Plan, but the 14D-9 fails to disclose which of the three different projection scenarios disclosed in the 14D-9 at page 43-44, the FY 2016 Plan represented. Morgan Stanley also opined that Party was unlikely to submit a proposal for the

Company.   Morgan Stanley also was of the view as expressed to the Board at this meeting that the stock component of the Brocade proposal was more valuable because in its view the stock was undervalued and based on future synergies that could be generated by a combined company.   The 14D-9 fails to disclose Morgan Stanley's basis for this view.  14D-9, p. 17.

55.      At this same meeting, the Board decided to reject the Brocade offer and have Morgan Stanley engage in discreet efforts to contact potential bidders. 14D-9, p. 18. Morgan Stanley informed the Board that private equity firms would likely be less interested in pursuing a potential transaction and any offers from private equity firms would likely be less competitive than their strategic counterparts given the Company's current profit margin structure. The 14D-9 fails to disclose Morgan Stanley's basis for this view. *Id.* The Board instructed Morgan Stanley to continue to engage with parties contacted thus far, and to reach out to private equity firms Parties E, F[5] and G. *Id.* The Board also approved Morgan Stanley's target guidance to private equity firms and any other all-cash bidders that the Company would expect an offer price of no less than $15.00 in cash per Share, but the 14D-9 fails to disclose the basis for this target. *Id.*

56.      When Brocade's advisor, Evercore learned that the Board rejected Brocade's initial proposal, Evercore advised Morgan Stanley that Brocade sought to have an agreement in place and disclosed publicly prior to the announcement of its first quarter 2016 results on February 17, 2016, which it expected to be strong.  Brocade also was interested in a tender offer transaction as it would not require a Ruckus stockholder vote. *Id.*

---

[5]  Party F dropped out of the process on February 12, 2016. 14D-9, p. 20.

57.     On February 5, 2016, the Company and Brocade entered into a confidentiality agreement with respect to a potential transaction which, among other things, provided for a one-year standstill that by its terms would terminate upon the Company's entry into a merger agreement with a third party, including Parent. 14D-9, p. 19.

58.     In February 2016, Party C indicated that it did not expect to make competitive bid. 14D-9, p. 18.

59.     On February 6, 2016, Ruckus representatives and Brocade representatives met to review Brocade financials, including two of Brocade's projection scenarios that are reflected in the 14D-9, and potential synergies. 14D-9, p. 19.

60.     Thereafter, Ruckus and Brocade continued their due diligence efforts. Morgan Stanley continued to reach out to Parties A, B, E, F, and G regarding a potential strategic transaction. 14D-9, p. 19.

61.     Morgan Stanley discussed Brocade's projections and other issues regarding the sales process with the Board at a  February 10, 2016 Board meeting (14D-9, p. 19) that was continued on February 12, 2016. 14D-9, p. 20.  At the February 12, 2016 meeting, Board elected to wait for Brocade's first quarter fiscal year 2016 earnings release on February 17, 2016 before making a counter offer to Brocade.   Also on February 12, 2016, Party B entered into a confidentiality agreement with the Company, with a one-year stand-still provision. 14D-9, p. 20.

62.     Party H contacted Morgan Stanley on February 11, 2016 regarding a potential strategic transaction. 14D-9, p. 20.

63.     Due diligence with Party B continued, including a meeting between management of each company on February 15, 2016. 14D-9, p. 20.

64.     At a February 18, 2016, special meeting, the Board met with members of Company senior management  and Morgan Stanley to review and understand the import of Parent's first quarter results and receive an update on the potential bidder outreach process. During the meeting, representatives of Morgan Stanley updated the Board on the status of discussions and management sessions with potential interested parties, noting that it did not believe Party A was interested in pursuing an opportunity with the Company at this time and that management sessions were being scheduled with Party C, Party E and Party G. Representatives of Morgan Stanley also discussed with the Board the results of Parent's first quarter fiscal year 2016 earnings and its updated fiscal year 2016 guidance and the fact that Parent's stock was then trading at a range that implied that the value of the initial January 27th proposal was approximately $13.00 per Share. The Company also entered into a confidentiality agreement on this date, that included a stand-still provision, with Party H and thereafter Ruckus representatives made a management presentation to Party H.  14D-9, p. 21.

65.     At a special Board meeting on February 21, 2016, Morgan Stanley reviewed  Ruckus' projections in the context of continuing as a standalone Company, with the Board including: (i) the "management case," which reflected the fiscal 2016 operating plan (which the Board considered fairly aggressive, but that Company management believed was achievable so long as the Company executed well), as well as management's long-term forecasts, and which assumes that revenue growth due to market adoption of the Company's small cell technology would begin in the second half

of fiscal year 2017 and that the Company's WLAN revenue growth will outpace the expected market growth by 3-4% annually, (ii) the "faster small cell" growth case, which assumes accelerated market adoption of the Company's small cell technology together with WLAN growth consistent with that assumed in the management case and which Company management viewed as extremely aggressive and unlikely to be achievable and therefore did not provide to Parent and (iii) the "slower small cell" growth case, which assumes that market adoption of the Company's small cell technology would take one year longer to mature than in the management case and that the Company's WLAN revenue would grow 16% in 2016 and then grow in line with the market's rate of growth for fiscal years 2017 through 2020. Morgan Stanley also reviewed implementing a share repurchase program (alone or in combination with the "faster small cell" and "slower small cell" alternatives), making a strategic acquisition, and engaging in a transaction with Brocade. 14D-9, p. 22.

66.    At the same meeting, Morgan Stanley discussed with the Board that several parties lacked interest and/or were concerned with the Company's margin profile. Thus, Morgan Stanley reviewed that Party C indicated on February 18, 2016 that it would only have interest in pursuing a potential transaction if Party C concluded that the Company's margin structure could be fundamentally improved without impairing the Company's expected revenue growth (which Company management did not believe likely but indicated to the Board it was evaluating). Representatives of Morgan Stanley also informed the Board that none of the private equity firms appeared to be likely to bid for the Company given the Company's current profit margin structure, with representatives of Morgan Stanley noting that private equity firms would be more likely

to find the combination of Parent and the Company attractive.  The 14D-9 fails to disclose what management did to conclude that the Company's margin structure could not be improved without impairing its expected revenue growth. *Id.*

67.    On February 21, 2016, Ruckus made a counter offer to Brocade at $8.00 in cash and 0.75 shares of Brocade for each Ruckus share. Brocade responded by revising its proposal to $6.25 in cash and 0.75 shares of Brocade stock per Ruckus share and requested a 30-day exclusivity period that could be extended indefinitely in one-week increments. 14D-9, p. 22.

68.    On February 29, 2016, the Board met to review Brocade's proposal and the status of the outreach to other potential bidders. 14D-9, p. 23.

69.    The Ruckus Board agreed on March 13, 2016 to negotiate exclusively with Brocade regarding a sale of the Company through March 31, 2016, plus an additional seven days if the parties were engaged in good faith negotiations to conclude the terms of a merger agreement.   14D-9, p. 4, 25.   Thereafter, Ruckus negotiated exclusively with Brocade regarding the following: (i) certain terms of a Merger Agreement (14D-9, p. 26); (ii) Lo negotiated for her and other Board members' and officers' equity award payouts and continued employment of her and numerous other executieves, and Brocade's  demand that Lo sign a tender and support agreement (14D-9, p. 26-27);

70.    Morgan Stanley and Company management also purportedly engaged in additional due diligence of Brocade (14D-9, p. 27).[6]

---

[6] The Defendants must disclose and clarify Morgan Stanley's and Company officers' due diligence of Brocade in view of the fact that the day after the Exchange/Tender Offer was commenced on April 29, 2016, Brocade announced that it will miss its fiscal Q2 revenue

71.     On April 3, 2016, the Board met to consider and vote on the Proposed

Transaction, including the employment and compensation agreements with Lo and others

and voted to approve the terms of the Proposed Transaction and the Merger

Consideration, and voted to approve the Proposed Transaction.  14D-9, p. 28.

### C.     The Proposed Transaction Undervalues Ruckus Shares

72.     The consideration offered to Ruckus' public stockholders in the Proposed

Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of

Ruckus common stock is materially in excess of the amount offered for those securities in the

proposed acquisition given the Company's prospects for future growth and earnings.   The

Proposed Transaction will deny Class members their right to fully share equitably in the true

value of the Company.   Indeed, the benefits obtained by Brocade outweigh those provided in the

Merger Consideration.  As a result, the Individual Defendants breached the fiduciary duties they

owe to the Company's public stockholders because those stockholders will not receive adequate

or fair value for their Company common stock in the Proposed Transaction.

73.     Ruckus has a demonstrated history of strong financial performance and significant

upward potential moving forward.

74.     The Company reported strong earnings results for the fourth quarter and year

ended December 31, 2015. For the quarter, the company reported total revenue of $100.1 million

against $85.8 million a year ago, an increase of 16.6%.   Operating income was $3,546,000

against $3,230,000 a year ago. Income before income taxes was $3,589,000 against $3,143,000 a

year ago. Net income was $2,820,000 or $0.03 per share diluted against $2,924,000 or $0.03 per

---

outlook, which some analysts predict will be by a wide margin, citing weakness in the storage
market broadly and weakness in telecom markets for networking. Brocade's stock price dropped
dramatically, over 12%, on this news, which due to the fixed exchange ratio in the Merger
Agreement severely negatively impacts the Merger Consideration.

share diluted a year ago. Non-GAAP operating income was $14,061,000 against $11,812,000 a year ago. Non-GAAP net income was $13,355,000 or $0.13 per share diluted against $11,543,000 or $0.12 per share diluted a year ago. Net cash provided by operating activities was $14,380,000 against $5,223,000 a year ago. For the year, the company reported total revenue of $373,376,000 against $326,919,000 a year ago. Operating income was $7,424,000 against $14,394,000 a year ago. Income before income taxes was $7,601,000 against $14,130,000 a year ago. Net income was $4,690,000 or $0.05 per share diluted against $8,190,000 or $0.09 per share diluted a year ago. Non-GAAP operating income was $44,009,000 against $43,302,000 a year ago. Non-GAAP net income was $42,363,000 or $0.43 per share diluted against $42,012,000 or $0.44 per share diluted a year ago. Net cash provided by operating activities was $35,864,000 against $36,726,000 a year ago.

75.    The Individual Defendant Lo characterized the results in a press release:

> Our fourth quarter revenue was impacted by a multi-million dollar E-rate opportunity that was postponed late in the quarter. Nevertheless, we achieved non-GAAP operating margin at the high-end of guidance, demonstrating strong operating execution …I believe our strategy remains sound and our product portfolio differentiated, keeping Ruckus in a position to **outgrow the market again in 2016**. We are equally focused on driving bottom-line growth in 2016, and we are committed to grow earnings faster than revenue, driving operating margin expansion throughout the year. (emphasis added).[7]

76.    The Company also touted its business and financial highlights that would have a direct impact on the future growth and success of the Company (and value for stockholders) in 2016:

- Shipped the industry's first virtual data plane for Wi-Fi that segregates data traffic from control traffic on large wireless networks, called Virtual SmartZone Data Plane (vSZ-D). vSZ-D works with Ruckus' Virtual SmartZone controllers, which provide a software-based system for

---

[7] www.sec.gov/Archives/edgar/data/1294016/000129401616000036/q42015ex-991.htm

managing wireless networks;

- Shipped 802.11ac wave 2 access points for Golden 1 Center, the future home of the Sacramento Kings, and the adjacent public plaza and surrounding mixed-use development;

- Selected by Western Sydney University to roll out a next generation high-capacity, high-speed Wi-Fi network using 802.11ac wave 2 access points across the multi-campus university serving more than 40,000 students;

- Installed 802.11ac access points at UNINOVE - Universidade Nove de Julho - one of the largest higher education institutions in Brazil. Ruckus access points were deployed across five campuses serving 150,000 students;

- 11ac access points in aggregate accounted for 79% of access point product sales in the fourth quarter of 2015, up from 74% in the third quarter of 2015. Wave 2 comprised 11% of access point product sales in the fourth quarter;

- The company reported 16.6% year-over-year revenue growth for the quarter; Americas revenue grew 17.3%, EMEA revenue grew 25.4% and APAC revenue grew 5.9% as compared to the fourth quarter of 2014;

- Non-GAAP operating margin was 14.0%, an increase compared with 13.9% in the third quarter of 2015 and 13.8% in the fourth quarter of 2014;

- Added 11 new service provider end-customers in the fourth quarter of 2015, bringing the total service provider end-customer base to over 260;

- Added approximately 4,300 enterprise end-customers in the fourth quarter of 2015, bringing the total enterprise end-customer base to over 65,000; and

- For the second year in a row, Ruckus was named a "Leader" in the IDC MarketScape: Worldwide Enterprise WLAN 2015-2016 Vendor Assessment. Ruckus is the only pure-play wireless vendor in the leaders category. IDC MarketScape credits Ruckus for "best-in-class RF innovation" and cited "portfolio enhancements to expand both upmarket and downmarket" in its assessment.

77.     The Company's third quarter 2015 results were equally impressive.   Revenue for the third quarter of 2015 was $99.0 million, an increase of 7.3% from the second quarter of 2015

and 16.4% from the third quarter of 2014. GAAP net income was $1.7 million for the third quarter of 2015, compared with GAAP net income of $0.8 million for the second quarter of 2015 and $3.6 million for the third quarter of 2014. GAAP operating income was $4.0 million for the third quarter of 2015, compared with GAAP operating income of $1.4 million for the second quarter of 2015 and $6.1 million for the third quarter of 2014. Non-GAAP net income was $13.3 million for the third quarter of 2015, compared with non-GAAP net income of $9.2 million for the second quarter of 2015 and $12.6 million for the third quarter of 2014. Non-GAAP operating income was $13.7 million for the third quarter of 2015, compared with non-GAAP operating income of $9.4 million for the second quarter of 2015 and $13.1 million for the third quarter of 2014. GAAP diluted net income per share was $0.02 for the third quarter of 2015, compared with $0.01 for the second quarter of 2015 and $0.04 for the third quarter of 2014. Non-GAAP diluted net income per share was $0.13 for the third quarter of 2015, compared with $0.09 for the second quarter of 2015 and $0.13 for the third quarter of 2014.

78.     Lo again praised the positive results and prospects for future growth:

> I am pleased with our results and execution in the quarter, as we continued to expand our technology leadership in the market and drove strong growth in the Americas and Europe … In the past month, we announced Ruckus Unleashed, our controller-less architecture, providing us with another lever for growth into the SMB segment. And last week, we announced the acquisition of Cloudpath Networks, giving us a certificate-based BYOD and policy solution which we believe is more secure and easier to use than competitive password-based solutions, and which we expect to be an important technology differentiator for Ruckus in education and other verticals going forward.[8]

79.     On July 29, 2015, Ruckus announced its financial results for the second quarter of 2015.  Revenue for the second quarter of 2015 was $92.2 million, an increase of 13.9% from the

---

[8] www.sec.gov/Archives/edgar/data/1294016/000129401615000030/q32015ex-991.htm.

second quarter of 2014. GAAP net income was $0.8 million for the second quarter of 2015, compared with GAAP net income of $1.4 million for the second quarter of 2014. GAAP operating income was $1.4 million for the second quarter of 2015, compared with GAAP operating income of $4.1 million for the second quarter of 2014. Non-GAAP net income was $9.2 million for the second quarter of 2015, compared with non-GAAP net income of $10.8 million for the second quarter of 2014. Non-GAAP operating income was $9.4 million for the second quarter of 2015, compared with non-GAAP operating income of $11.1 million for the second quarter of 2014. GAAP diluted net income per share was $0.01 for the second quarter of 2015, compared with $0.02 for the second quarter of 2014. Non-GAAP diluted net income per share was $0.09 for the second quarter of 2015, compared with $0.11 for the second quarter of 2014.

80.     Lo praised the positive results and prospects for future growth

> We are very pleased with our results in the second quarter, as we displayed strength across all of our geographies and verticals … Ruckus reported **revenue above our guidance and market share gains** based on the latest WLAN market reports from Dell'Oro and Infonetics. We continued to raise the bar in wireless performance with shipments of the industry's first enterprise-class 802.11ac Wave 2 product in the second quarter. Our new CloudManager for Xclaim is enabling WISPs to deliver low cost managed services. Further, with new and expanded partnerships, we continue to enhance our competitive position and expand our market opportunities.[9]

81.     Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to Ruckus' public stockholders because they will not be able to see a fair return on Ruckus' strong potential for future growth.

82.     Brocade as aided and facilitated the Board's breaches and harmed Ruckus stockholders by increasing the authorization to repurchase its common stock under its existing

---

[9] www.sec.gov/Archives/edgar/data/1294016/000129401615000022/q22015ex-991.htm.

stock repurchase program by $800 million, bringing the total remaining amount authorized under the program to approximately $1.7 billion. This increase is intended to facilitate the repurchase of all shares issued in conjunction with the Ruckus acquisition. While Brocade has targeted the repurchase of all those shares within six months of the closing of the acquisition, the timing and amounts of these acquisition-related repurchases will be determined by Brocade, based on the trading price of Brocade's common stock, general business and market conditions, and other factors. The repurchases may be made in the open market or in privately negotiated transactions.

83.     The Proposed Transaction represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members by denying Class members their right to share proportionately and equitably in the true value of the Company.

### D.     The Preclusive Deal Protection Provisions and Other Actions to Deter Superior Offers and Ensure Consummation of Proposed Transaction

84.     In addition to failing to obtain adequate consideration for Ruckus stockholders, the Individual Defendants agreed to certain deal protection devices that operate conjunctively to lock-up the Proposed Transaction and ensure that no competing offers will emerge for the Company.

85.     First, the Merger Agreement provides for an onerous no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain the best price possible under the circumstances.   Specifically, section 8.2(a) of the Merger Agreement requires the Company to cease any discussions that could lead to a superior proposal and further prohibits Defendants from doing the following:

> (i)     solicit, initiate, support, knowingly induce or knowingly encourage (including by way of furnishing information which has not been previously publicly disseminated), or take any other action with the

intent to facilitate, any inquiry, proposal, indication of interest or offer which constitutes, or could reasonably be expected to lead to, a Company Acquisition Proposal;

(ii)    subject to this Section 8.2(a) and Section 8.2(b), approve, endorse or recommend, or authorize any public statement approving, endorsing or recommending, or execute or enter into any letter of intent, memorandum of understanding, agreement in principle, merger agreement or other agreement, arrangement, or Contract relating to a Company Acquisition Proposal (other than an Acceptable Confidentiality Agreement) (each an "Alternative Acquisition Agreement"),

(iii)    enter into, continue or otherwise participate in any discussions or negotiations regarding any Company Acquisition Proposal,

(iv)    furnish to any Person (other than Parent, its Affiliates and their respective Representatives) any non-public information or data relating to the Company or any of its Subsidiaries, in connection with, or with the intent of encouraging or facilitating a Company Acquisition Proposal or that could reasonably be expected to be used for the purposes of any Company Acquisition Proposal,

(v)    submit any Company Acquisition Proposal to a vote of the stockholders of the Company, or

(vi)    agree or publicly propose to do any of the foregoing.

86.    Additionally, Section 8.2(b) of the Merger Agreement grants Brocade recurring and unlimited matching rights, which provides it with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) four (4) business days to negotiate with Ruckus, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.  Section 8.2(c) requires the Company to notify Brocade within one (1) business day that has received an inquiry, proposal or offer.  To further suppress any efforts by potential bidders to  even reach out to the Company, section 8.2(d) prohibits the Company from releasing any third parties from any existing standstill and/or confidentiality commitments.

87.     Furthermore, Individual Defendant Lo, and on information and belief other significant Ruckus stockholders, entered into a Tender and Support Agreement ("Agreement") that virtually locks-up the Proposed Transaction and undoubtedly deters superior offers for the Company.  Indeed, pursuant to the Agreement  or otherwise, Lo and others have agreed to tender all of their shares, which represent approximately 11.8% of the voting power of the Company's common stock, within 10 days of the start of the Tender Offer, ensuring the Tender Offer will exchange the 50% tender threshold required for the Merger to proceed.

88.     Lo and others were incentivized to agree to lock up the Proposed Transaction with Brocade based on special financial incentives not available to Ruckus' other stockholders:

> As described below, as a condition to Parent's agreement to enter into the Merger Agreement, Ms. Lo, the President and Chief Executive Officer of the Company, and Seamus Hennessy, Chief Financial Officer of the Company, executed offer letters with Parent (each such letter, an "Offer Letter"). Under the terms of their Offer Letters, and notwithstanding the Company RSU and Company PSU treatment described above, Ms. Lo and Mr. Hennessy agreed to the following treatment of their unvested Company RSUs and Company PSUs:
>
> (i) the vesting of 50% of their unvested Company RSUs and Company PSUs will be accelerated and will be paid upon the closing of the Merger (the "Closing"); and
>
> (ii) 50% of their unvested Company RSUs and Company PSUs will be converted into Parent RSUs (230,250 Parent RSUs, in the case of Ms. Lo, and 150,000 Parent RSUs, in the case of Mr. Hennessy), which will vest on the one-year anniversary of the Closing, subject to their continued employment with Parent, and be settled as soon as practicable thereafter.

14D-9, p. 8.

89.     The non-solicitation and matching rights provisions, when coupled with the Tender and Support Agreement and vesting rights obtained by Lo as an incentive for Lo and others to support the Proposed Transaction, ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making

a superior proposal while knowing that Brocade can easily foreclose a competing bid, and that a significant percentage of the Company's shares must be tendered via the Tender Offer regardless of whether a better offer has been made.  As a result, these provisions unreasonably favor Brocade, to the detriment of Ruckus' public stockholders.

90.     Lastly, section 10.3 of the Merger Agreement provides that Ruckus must pay Brocade a termination fee of $50 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  Accordingly, the termination fee provision further ensures that no competing offer will appear, as any competing bidder would have to pay a naked premium for the right to provide Ruckus' stockholders with a superior offer.

91.     Ultimately, these deal protection provisions unreasonably restrain Ruckus' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

**E.     The 14D-9 Provides Stockholders With Materially Incomplete and Misleading Information Concerning the Proposed Transaction**

92.     On April 29, 2016, Defendants caused the materially incomplete and misleading 14D-9 to be filed with the SEC.  While the 14D-9 provides a summary of the strategic review process the Board undertook prior to voting to enter into the Merger Agreement with Brocade, and the financial analyses of Morgan Stanley performed in support of its fairness opinion, it omits certain critical information which render portions of the 14D-9 materially incomplete and misleading.  As a result of the incomplete and misleading 14D-9, Ruckus' stockholders will be unable to make an informed decision concerning whether to tender their shares

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction**

93.     First, the 14D-9 fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the **Background and Reasons for the Recommendation**, *Background of the Offer and the Merger* sections contained on pages 14-28 of the 14D-9  is materially deficient in that it fails to disclose, but must disclose, the following information:

(a)     The basis and rational for the Board's decision to pursue strategic alternatives, including the sale of the Company;

(b)     The basis for Morgan Stanley's belief that Brocade and Party A were the most likely candidates to enter into a strategic acquisition of the Company;

(c)     The basis and rationale for engaging Morgan Stanley as financial advisor and whether other financial advisors were vetted;

(d)     The composition of the Ad Hoc Committee and the rational for creating the Ad Hoc Committee;

(e)     Whether the confidentiality agreements entered into with the other potential bidders described in the Background of the Offer and Merger contained standstill provisions similar to those in the Brocade confidentiality agreement, including allowing for confidential communications regarding a proposal;

(f)     The basis for the Board's agreement to a fixed exchange ratio as part of the Merger Consideration;

(g)     The reason and rational for the Board's failure to instruct Morgan Stanley or otherwise to engage in a full auction and/or market check;

(h)     Any and all information regarding the discussions that took place regarding the continued employment of Lo and Seamus Hennessy, Chief Financial Officer,

and/or any other Ruckus officer, director or employee following a strategic transaction, including but not limited to timing, content, communications, parties, and form of such indication;

(i)     Whether the Company and/or Brocade forecasts and/or projections that are referenced in the Background to the Offer and Merger section of the 14D-9 were updated prior to the execution of the Merger Agreement on April 3, 2016; and

(j)     A full description of the due diligence conducted by Ruckus and/or Morgan Stanley of Brocade including especially the access to Brocade management created historical and/or projected financial data (other than the 2016 and 2017 limited projected line item metrics that were publicly available as of September 2015 and the extrapolation by Brocade of those projections to 2018).

94.     Defendants' failure to provide Ruckus stockholders with the foregoing material information constitutes a violation of the Exchange Act, and SEC Rules promulgated thereunder as more fully described in the Counts below. Absent disclosure of the foregoing material information prior to the expiration of the exchange/tender offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to exchange/tender their shares are thus threatened with irreparable harm warranting the injunctive relief sought herein.

**Materially Incomplete and Misleading Disclosures Concerning Ruckus' Financial Information and Banker Analysis**

95.     Further, the 14D-9 fails to disclose critical Ruckus non-public projected financial data and/or assumptions (prepared in accordance with generally accepted accounting principles ("GAAP") and non-GAAP financial data) relating to the Company's future performance. The 14D-9 makes clear, that both the Board and Morgan Stanley relied continuously throughout the sales process on this information to reach a decision to enter into the Merger Agreement with Brocade and that the Board relied on this information to recommend that Ruckus stockholders

tender/exchange their shares for the Merger Consideration. The omission of this information renders the 14D-9 false and/or misleading as this information was relied on and utilized by the Board and Morgan Stanley.

96.     Throughout the process to explore strategic alternatives and other alternatives for the Company, the Board and Morgan Stanley[10] continually reviewed Company projections, prepared by Ruckus management (including on August 7, 2015,[11] November 4, 2015,[12] January 15, 2016,[13] February 1, 2016,[14] and February 21, 2016[15]), but Defendants have failed to disclose

---

[10]"In performing the financial analyses summarized below and arriving at its opinion, Morgan Stanley used and relied upon the Company Forecasts (defined below). These financial projections are more fully described below in this Item 4 under the heading '*Certain Financial Forecasts*'" 14D-9, p. 34.

[11] "The Board further instructed management to prepare a detailed analysis of the Company's business and **financial expectations for the following eight quarters**…" 14D-9, p. 15.

[12] "[t]he Board held a regularly scheduled meeting at which, among other things, management presented on a preliminary basis its **long-term forecast** for the Company." 14D-9, p. 15.

[13] "[m]embers of Company management, including Ms. Lo, Mr. Hennessy, Mr. Rabinovitsj and Greg Beach, VP Product Management of the Company, as well as Mr. Burstein, met with members of management of Parent, including Mr. Cheng Mr. Fairfax, Mr. Rado, Mr. Nolet, Jeff Lindholm, Senior Vice President of Worldwide Sales of Parent, and Carol Goode, Senior Vice President of Human Resources of Parent, and representatives of Morgan Stanley and representatives of Evercore Group L.L.C. ("Evercore"), Parent's financial advisor, to present Parent with responses to Parent's December 1, 2015 due diligence request. The Company provided Parent with, among other things, its view of its market opportunities and products, product roadmap and competitive position, go-to-market profile, historical financial performance, **financial projections** (as described in this Item 4 under the heading "*Certain Financial Forecasts—Financial Forecasts of the Company*"), and the possible strategic benefits from a combination of the two companies." 14D-9, p. 17.

[14] "[t]he Board held a regularly scheduled meeting, at which members of Company senior management and the Company's regular external legal counsel and representatives of Morgan Stanley were in attendance. The Board discussed, among other things, the financial performance of the Company in FY 2015 **against plan, and the FY 2016 plan**, as well as **the long-term forecasts that management had prepared in November 2015** and previously presented to the Board and that were included in the management presentations the Company had made to Party A and Parent in December 2015 and January 2016, respectively. The Board approved the FY

this information and/or have disclosed only certain non-GAAP projected metrics that render the statements, Board recommendation, and/or Morgan Stanley analysis and opinion false and/or misleading.

97. The Company Management Case Forecasts, Company Faster Small Cell Forecasts, and Company Slower Small Cell Forecasts (14D-9, pp. 43-44) are rendered false and/or misleading because, while the Defendants disclosed projected Revenue, Adjusted EBITDA, and Non-GAAP EPS, the underlying assumptions and data inputs utilized to calculate those forecasts are not disclosed, including projected non-GAAP net income (loss)(and non-GAAP fully diluted share count used to calculate non-GAAP EPS), stock-based compensation expenses, capital expenditures, amortization of intangible assets, acquisition-related payments and "GAAP and non-GAAP tax adjustments." The failure to disclose these inputs, to explain reconciliation of GAAP and non-GAAP financial projected data for purposes of reporting the financial data in the 14D-9 violates SEC regulatory mandates and policy and renders the Company projected financial data and Morgan Stanley valuation analysis that utilized such data,[16] false and/or misleading, and renders the Board's recommendation false and/or misleading.

---

2016 Plan, which the Board considered fairly aggressive but that Company management believed was achievable so long as the Company executed well." 14D-9, p. 17.

[15] "…Morgan Stanley reviewed with the Board financial aspects of the following potential alternatives: (1) maintaining the status quo as a standalone company under three different scenarios: (a) the management case, which reflected the fiscal 2016 operating plan (which the Board considered fairly aggressive, but that Company management believed was achievable so long as the Company executed well), **as well as management's long-term forecasts**, and which assumes that revenue growth due to market adoption of the Company's small cell technology would begin in the second half of fiscal year 2017 and that the Company's WLAN revenue growth will outpace the expected market growth by 3-4% annually, …" 14D-9, p. 21-22.

[16] This includes Morgan Stanley's Discounted Equity Value Analysis (p. 39), which used Ruckus' estimated 2018 EPS estimates (presumably referring to the Company's "non-GAAP EPS" even though the Morgan Stanley analysis omits the term "non-GAAP").

Further, the 14D-9 discloses that the Individual Defendants acted on and issued its recommendation for Ruckus stockholders to exchange/tender their Ruckus shares based on consultation with counsel, and therefore they were fully apprized of their legal and regulatory obligations and their failure to disclose and reconcile GAAP and non-GAAP projections and otherwise disclose Company forecasts in an accurate and non-misleading manner evidences that they acted willfully, with full knowledge of their obligations.[17]

98.     The section of the 14D-9 entitled "Reasons for the Board's Recommendation" discloses the Board's bases for and/or information relied on to recommend that stockholders vote in favor of the Proposed Transaction, including the following: (i) the "the risks inherent in the Company's ability to execute against its standalone plan, including the increasing competition facing the Company, general uncertainty surrounding macroeconomic conditions in various markets in which the Company does business, risks associated with the timing of market adoption of the Company's small cell technology and other risks set forth in the section entitled "Risk Factors" in the Prospectus/Offer to Exchange"; (ii) the "recent and expected continued industry consolidation in the Company's markets, which has made, and is expected to make, it more difficult, for the Company to compete as a stand-alone company"; (iii) Morgan Stanley's fairness opinion, reflected in "Opinion of the Company's Financial Advisor" 14D-9, pp. 29-30.

99.     The Board's recommendation as reflected above in ¶98  is false and/or misleading because, the information that forms the basis for the Board's recommendation reflected above, including the Company's non-public data and other internal information regarding its future

---

[17] The Brocade Forecasts were determined in a similarly false and/or misleading manner with respect to Brocades' Low Range Forecasts, Mid Range Forecasts, and High Range Forecasts (14D-9, p. 45), on which the Board and Morgan Stanley relied , and which similarly must be corrected.

performance (e.g., projections including cash flows and other data described in ¶97), that stockholders tender their shares, is not disclosed.  The information described in ¶97 must be disclosed. Absent the data on the Company's future performance, stockholders cannot to weigh and gauge the Board's recommendation or Morgan Stanley's valuations and opinion.  This material information must be disclosed to stockholders prior to the expiration of the tender offer.

100.    The 14D-9 also discloses (at 34) that Morgan Stanley reviewed and relied on the following information to render its fairness opinion: (i) "certain internal financial statements and other financial and operating data concerning the Company and Parent, respectively"; (ii) "viewed certain financial projections prepared by the managements of the Company and Parent, respectively"; (iii) reviewed information relating to certain strategic, financial and operational benefits anticipated from the Merger, prepared by the managements of the Company and Parent, respectively; (iv) "discussed the past and current operations and financial condition and the prospects of the Company, including information relating to certain strategic, financial and operational benefits anticipated from the Merger, with the Company's senior executives;" (v) "reviewed the pro forma impact of the Merger on Parent's earnings per share, cash flow, consolidated capitalization and financial ratios"; (vi) "performed such other analyses, reviewed such other information and considered such other factors as Morgan Stanley deemed appropriate";  (vi)  "With respect to the financial projections, including information relating to certain strategic, financial and operational benefits anticipated from the Merger, Morgan Stanley assumed that they had been reasonably prepared on bases reflecting the best currently available estimates and judgments of the respective managements of the Company and Parent of the future financial performance of the Company and Parent"; (vii) "In performing the financial analyses

summarized below and arriving at its opinion, Morgan Stanley used and relied upon the Company Forecasts (defined below)." 14D-9, pp. 33-34.

101.    Additionally, Morgan Stanley expressly stated in summarizing its *Discounted Cash Flow Analysis* (14D-9, pp. 37-38) that it relied on and/or utilized the following:

> *Discounted Cash Flow Analysis*
>
> Morgan Stanley performed a discounted cash flow analysis, which is designed to provide an implied value of a company by calculating the present value of the estimated future cash flows and terminal value of such company.  Morgan Stanley calculated a range of equity values per Share based on a discounted cash flow analysis to value the Company as a stand-alone entity. Morgan Stanley utilized estimates from the Company Forecasts (consisting of the Company Slower Small Cell Forecasts, the Company Management Case Forecasts and the Company Faster Small Cell Forecasts, each as defined below) for purposes of its discounted cash flow analysis, as more fully described below. The Company Forecasts are more fully described below in this Item 4 under the heading "*Certain Financial Forecasts—Financial Forecasts of the Company*".
>
> Morgan Stanley first calculated the **estimated free cash flow**, which is defined as adjusted earnings before interest, taxes, depreciation and amortization, **less** (1) **stock-based compensation expense**, (2) taxes and (3) **capital expenditures**, and less or plus, as applicable, (4) changes in **working capital**. The Company Forecasts through 2020 were based on projections prepared by the Company's management, and the estimates for calendar years 2021 through 2025 represented an extrapolation of 2020 estimates. Based on the variable year-to-year growth rate present in these projections and extrapolations, Morgan Stanley calculated the **net present value of free cash flows for the Company for the years 2016 through 2025 and calculated terminal values in the year 2025.** The free cash flows and terminal values were discounted to present values as of April 1, 2016 (the last full trading day prior to the meeting of the Board to approve and adopt the Merger Agreement) at rates of 8.7%, 9.7%, and 10.7%, which discount rates were selected, upon the application of Morgan Stanley's professional judgment and experience, to reflect the Company's weighted average cost of capital.

102.    However, the above emphasized information, including the projected free cash flows and the metrics used to calculate free cash flows (stock-based compensation ("SBC") expense, taxes, capital expenditures, working capital), is not disclosed in the 14D-9 to Ruckus

stockholders. The failure to disclose this information renders the 14D-9 false and/or misleading.[18] Without this information, Ruckus stockholders have no way to determine the projected financial information utilized by Morgan Stanley in its analysis, which undermines the credibility of the Morgan Stanley fairness opinion and renders the content and substance of said fairness opinion false and/or misleading, and negatively impacts stockholders' ability to weigh and measure the Morgan Stanley fairness opinion.

103. The failure to disclose the information in ¶¶96, 97, 100, 101 above reflecting Ruckus' projected future performance metrics specifically renders the 14D-9 false and/or misleading with respect to the following estimated implied value per Share as of April 1, 2016, from the *Discounted Cash Flow Analysis* (p. 38):

| | Terminal Value Perpetual Growth Rate | Implied Value Per Share ($) |
|---|---|---|
| Company Slower Small Cell Forecasts | 1.0% – 3.0% | 11.51 – 16.17 |
| Company Management Case Forecasts | 1.0% – 3.0% | 14.57 – 21.10 |
| Company Faster Small Cell Forecasts | 1.0% – 3.0% | 17.12 – 25.43 |

104. Further, the failure to disclose the information in ¶¶96, 97, 100, 101 reflecting Ruckus' projected future performance metrics renders the 14D-9 false and/or misleading with respect to the following implied value of the Offer Consideration received per Share from the *Discounted Cash Flow Analysis* below (p. 38):

| | Implied Value Per Share ($) |
|---|---|

---

[18] The exclusion of SBC (including by the Company as reflected in the projections at p. 44)  and other expenses impacts EBITDA as  SBC represents a significant expense for the Company. At March 31, 2016, the total unrecognized stock-based compensation expense under the Company's stock plans was $55.1 million, net of estimated forfeitures. www.sec.gov/Archives/edgar/data/1294016/000129401616000076/q1201610-q.htm

| | |
|---|---|
| Company Slower Small Cell Forecasts/ Parent Low Range Forecasts | 15.95 – 19.56 |
| Company Management Case Forecasts / Parent Mid Range Forecasts | 17.61 – 22.35 |
| Company Faster Small Cell Forecasts / Parent High Range Forecasts | 19.17 – 25.18 |

105.    Further, the failure to disclose the information in ¶¶96, 97, 100 above reflecting Ruckus' projected future performance metrics renders the 14D-9 false and/or misleading with respect to the following analysis of the implied exchange ratio of the relative discounted cash flows per Share of the Company and Parent (without taking account of Synergies) from the *Discounted Cash Flow Analysis* (p. 39):

| | Implied Exchange Ratio |
|---|---|
| Company Slower Small Cell Forecasts / Parent Low Range Forecasts | 0.92x – 0.98x |
| Company Management Case Forecasts/ Parent Mid Range Forecasts | 1.02x – 1.08x |
| Company Faster Small Cell Forecasts / Parent High Range Forecasts | 1.07x – 1.11x |

106.    With respect to Morgan Stanley's *Discounted Equity Value Analysis* (14D-9, p. 39), Morgan Stanley used "calendar year 2018 EPS estimates from the Company Forecasts." While the 2018 Company Forecasts include 2018 EPS, that metric is based on non-GAAP EPS, which at footnote 3 on page 44 discloses is calculated based on **non-GAAP EPS from non-GAAP net income (loss) using non-GAAP fully diluted share count**. None of the Ruckus non-GAAP income forecast has been disclosed rendering this entire analysis false and misleading, including the following table of P/E multiples and Implied Present Value Per Share:[19]

| Calendar Year 2018 EPS | P/E Multiple Range | Implied Present Value Per |
|---|---|---|

---

[19] SEC regulations expressly address the utilization of non-GAAP metrics and provide that the disclosure of revenue figures, which the Defendants disclosed, are misleading if not accompanied by net income and other metrics:

> Revenues, net income (loss) and earnings (loss) per <u>share</u> usually are presented together in order to avoid any misleading inferences that may arise when the individual items reflect contradictory trends. There may be instances, however, when it is appropriate to present earnings (loss) from continuing operations, or income (loss) before extraordinary items in addition to or in lieu of net income (loss). It generally would be misleading to present sales or revenue projections without one of the foregoing measures of income.  17 C.F.R. Sec. 229.10.

|  |  | Share ($) |
|---|---|---|
| Company Slower Small Cell Forecasts | 17.0x – 19.0x | 11.25 – 12.57 |
| Company Management Case Forecasts | 18.0x – 20.0x | 14.98 – 16.64 |
| Company Faster Small Cell Forecasts | 19.0x – 21.0x | 17.10 – 18.90 |

107.    Additionally, use of the non-GAAP EPS and the failure to disclose Ruckus'
additional forecasts renders the following table of P/E Multiple Ranges and Implied Present
Value Per Share (at 40) false and/or misleading:

The following table summarizes Morgan Stanley's analysis:

| Calendar Year 2018 EPS | P/E Multiple Range | Implied Present Value Per Share ($) |
|---|---|---|
| Parent Low Range Forecasts | | 15.00 – |
| | 10.0x – 12.0x | 16.71 |
| Parent Mid Range Forecasts | | 15.57 – |
| | 10.0x – 12.0x | 17.39 |
| Parent High Range Forecasts | | 17.10 – |
| | 11.0x – 13.0x | 19.04 |

108.    Due to the failure to disclose the forecasted Ruckus metrics described above,
which Morgan Stanley expressly discloses it relied on to perform its *Relative Contribution
Analysis* (14D-9, p. 41), Morgan Stanley Relative Contribution Analysis Range of Exchange
Rations table is false and/or misleading:

The following table summarizes Morgan Stanley's analysis:

|  | Range of Exchange Ratios |
|---|---|
| 2015 – 2017 Revenue | 0.82x – 1.07x |
| 2015 – 2017 Gross Profit | 0.82x – 1.10x |
| 2015 – 2017 EBITDA | 0.50x – 0.79x |
| 2015 – 2017 Net Income | 0.41x – 0.63x |

109.    The projected financial information and data provide a sneak peek into Ruckus'
expected future performance (i.e., growth/profitability) and, consequently, its value as a
standalone entity.  More importantly, however, this expected performance is more reliable than
similar forecasts prepared by third-party analysts and other non-insiders as it comes from

members of corporate management who have their fingers on the pulse of the Company. Accordingly, it is no surprise that projected financial metrics and data are among the most highly sought after disclosures by stockholders in the context of corporate transactions such as this.

110.    Morgan Stanley describes its fairness opinion and the various valuation analyses it performed to render its opinion.   However, Morgan Stanley's description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.   Without this information, one cannot determine whether or not the implied per share equity values set forth in the 14D-9 accurately reflect the true value of Ruckus shares.

111.    With respect to Morgan Stanley's *Public Trading Comparables Analysis*, the 14D-9 (p. 35) fails to disclose the following, specifically relied on and/or utilized by Morgan Stanley:

(a)    A valuation summary detailing the calculation of fully diluted shares;

(b)    The observed company-by-company multiples and financial metrics;

(c)    The basis for Morgan Stanley's decision to apply a selected multiple reference ranges and whether the selected ranges represent the high/low, mean and/or median;

112.    The failure to disclose the above information renders the below table reflecting Morgan Stanley's *Public Trading Comparables Analysis* false and/or misleading:

| Calendar Year Financial Statistic | Comparable Company Multiple Ranges | Implied Value Per Share ($) |
|---|---|---|
| **Street Case** | | |
| Aggregate Value to Estimated 2016 Adjusted EBITDA | 9.0x – 11.0x | 8.60 – 9.95 |
| Price to Estimated 2016 Earnings | 16.0x – 20.0x | 8.83  11.04 |
| Aggregate Value to Estimated 2017 Adjusted EBITDA | 7.0x – 10.0x | 8.61 -11.22 |
| Price to Estimated 2017 Earnings | 13.0x – 17.0x | 7.83 -10.23 |

113.    With respect to Morgan Stanley's *Precedent Transaction Analysis*, the 14D-9 (p.

36) fails to disclose the following, specifically relied on and/or utilized by Morgan Stanley:

(a)     The observed company-by-company multiples and financial metrics for

the Selected Networking Equipment Vendor Transactions;

(b)     The identity of the 24 transactions occurring between 2014 and April 1,

2016 that involved the acquisition of U.S. publicly-listed companies for values greater than $300

million in which both the stock consideration and the cash consideration were between 40% and

60% of the total consideration   ("Precedent Cash/Stock Transaction Premia") or any of the

financial statistics with respect to these transactions;[20]

(c)     The basis for Morgan Stanley's decision to apply a selected multiple

reference ranges of implied premia and financial multiples of the transactions, and whether the

selected ranges represent the high/low, mean and/or median;

114.    The failure to disclose the above information renders the below table reflecting

Morgan Stanley's *Precedent Transaction Analysis* false and/or misleading:

| Precedent Transactions Financial Statistics | Representative Ranges | Implied Value Per Share ($) |
|---|---|---|
| **Precedent Networking Equipment Vendor M&A Transaction Multiples** | | |
| Aggregate Value to LTM Revenue | | 9.66 – |
| | 2.0x – 3.5x | 14.98 |
| Price to LTM Earnings per Share | 18.0x – | 7.74 – |
| | 25.0x | 10.75 |
| **Precedent Cash/Stock Transaction Premia** | | |

_____

[20] The 14D-9 discloses the parameters of the statistics, but no data, to include: (1) the implied
premium to the acquired company's closing share price on the last trading day prior to
announcement (or the last trading day prior to the share price being affected by acquisition
rumors or similar merger-related news); (2) the implied premium to the acquired company's 30-
trading-day average closing share price prior to announcement (or the last 30-trading-day
average closing share price prior to the share price being affected by acquisition rumors or
similar merger-related news); and (3) the implied premium to the acquired company's last twelve
month high share price prior to announcement (or the last twelve month high share price prior to
the share price being affected by acquisition rumors or similar merger-related news). 14D-9, p.
36.

| | | |
|---|---|---|
| Premium to 1-Day Prior Closing Share Price | | 11.50 – |
| | 15% – 40% | 14.00 |
| Premium to 30-Day Average Closing Share Price | | 11.72 – |
| | 20% – 40% | 13.67 |
| Premium to Last Twelve Month High Share Price | | 12.64 – |
| | (5%) – 5% | 13.97 |

115.   With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the 14D-9 (p. 37-38), in addition to the above-described financial projections, fails to disclose the following, specifically relied on and/or utilized by Morgan Stanley:

(a)      Estimated free cash flows for the years 2016 through 2025 for Ruckus and Brocade;[21]

(b)      As described above, the Company's projected line item metrics on a GAAP and non-GAAP basis (if applicable), including projected net income, stock-based compensation expenses, taxes and capital expenditures and working capital that were utilized by the Company to create the Company Forecasts on pages 43-44 (Company Management Case, Company Small Cell Forecast and Company Slower Small Cell Forecasts);

---

[21]   As described in the 14D-9, p. 38, "Morgan Stanley utilized estimates from the Parent Forecasts (consisting of the Parent Low Range Forecasts, the Parent Mid Range Forecasts and the Parent High Range Forecasts, each as defined below) and the Synergies for purposes of its discounted cash flow analysis of the combined Parent and Company discounted cash flow analysis. The Parent Forecasts and the Synergies are more fully described below in this Item 4 under the heading "*Certain Financial Forecasts*". Morgan Stanley's calculation of Parent free cash flow used the same methodology as described for the Company's free cash flow above. The Parent Forecasts through 2018 were based on projections prepared by Parent for fiscal years 2016 and 2017 and a financial model prepared by Parent for fiscal year 2018 (as described below under the heading, "*Certain Financial Forecasts—Financial Forecasts for Parent*"), and the estimates for calendar years 2019 through 2025 represented an extrapolation of 2018 estimates. Morgan Stanley calculated the net present value of free cash flows for Parent for the years 2016 through 2025 and calculated terminal values in the year 2025. The free cash flows and terminal values were discounted to present values as of April 1, 2016 (the last full trading day prior to the meeting of the Board to approve and adopt the Merger Agreement) at rates of 6.7%, 7.5%, and 8.4% and at perpetual growth rates ranging from -1.0% – 2.0% depending on the particular Parent Forecast case. The discount rates and perpetual growth rates were selected, upon the application of Morgan Stanley's professional judgment and experience, to reflect Parent's weighted average cost of capital and estimates long-term growth rate."

(c)     Morgan Stanley's extrapolation of the Company Forecasts from 2021 to 2025 and the basis for this extrapolation;

(d)     The variable year-to-year growth rate present in these projections and extrapolations;

(e)     The basis for the selected discount rates, including the assumptions for calculating the Company's weighted average cost of capital;

(f)     The effect given to the Merger and the manner for incorporating the value of certain synergy forecasts;

(g)     The basis for Morgan Stanley's selection of the representative ranges of perpetual growth rates as applied to calculate terminal value, and whether the selected growth represent the high/low, mean and/or median;

116.    The failure to disclose the above information renders the below table reflecting Morgan Stanley's estimated implied value per share in its *Discounted Cash Flow Analysis,* false and/or misleading:

|  | Terminal Value Perpetual Growth Rate | Implied Value Per Share ($) |
|---|---|---|
| Company Slower Small Cell Forecasts | 1.0% – 3.0% | 11.51 – 16.17 |
| Company Management Case Forecasts | 1.0% – 3.0% | 14.57 – 21.10 |
| Company Faster Small Cell Forecasts | 1.0% – 3.0% | 17.12 – 25.43 |

117.    The failure to disclose the above information renders the below table showing the implied value of the merger consideration received per share in Morgan Stanley's *Discounted Cash Flow Analysis,* false and/or misleading:

|  | Implied Value Per Share ($) |
|---|---|
| Company Slower Small Cell Forecasts/ Parent Low Range Forecasts | 15.95 – 19.56 |
| Company Management Case Forecasts / Parent Mid Range Forecasts | 17.61 – 22.35 |

| Company Faster Small Cell Forecasts / Parent High Range Forecasts | 19.17 – 25.18 |

118.    The failure to disclose the above information renders the below table showing the implied exchange ratio of the relative discounted cash flows per share of the Company and Brocade (absent synergies) in Morgan Stanley's *Discounted Cash Flow Analysis,* false and/or misleading:

| | Implied Exchange Ratio |
|---|---|
| Company Slower Small Cell Forecasts / Parent Low Range Forecasts | 0.92x – 0.98x |
| Company Management Case Forecasts/ Parent Mid Range Forecasts | 1.02x – 1.08x |
| Company Faster Small Cell Forecasts / Parent High Range Forecasts | 1.07x – 1.11x |

119.    With respect to Morgan Stanley's *Discounted Equity Value Analysis*, in addition to the individual metrics utilized to calculate non-GAAP EPS, the 14D-9 (p. 39-40) fails to disclose the following, specifically relied on and/or utilized by Morgan Stanley:

(a)    The rationale for using Ruckus' and Brocade's 2018 EPS estimates;

(b)    The adjustments that were made to projected earnings based on the possible share buyback, and the rationale and basis for assuming a $100 million Share buyback at the buyback price of $10.00 per Share;

(c)    The manner of calculating the price to earnings multiples (including assumptions, inputs and terminal  and whether the ranges of multiples that were applied to the estimated earnings reflected a high/low, mean to median range;

(d)    The inputs, assumptions and other factors for utilizing a discount rate of 9.7%;

(e)    The "growth profile" of Ruckus, that Morgan Stanley applied to the range of P/E mulitples.

120.    The failure to disclose the above information renders the below table showing the

Morgan Stanley's *Discounted Equity Value Analysis* false and/or misleading:

| Calendar Year 2018 EPS | P/E Multiple Range | Implied Present Value Per Share ($) |
|---|---|---|
| Company Slower Small Cell Forecasts | 17.0x – 19.0x | 11.25 – 12.57 |
| Company Management Case Forecasts | 18.0x – 20.0x | 14.98 – 16.64 |
| Company Faster Small Cell Forecasts | 19.0x – 21.0x | 17.10 – 18.90 |

121.    The 14D-9 discloses that Morgan Stanley then "compared the above Company

per Share values with the potential future equity value of Brocade, giving effect to the Offer and

the Merger and the contribution of the Company based on the Company Management Case

Forecasts and the Synergies. In connection with this analysis, Morgan Stanley calculated a range

of implied present equity values per Share. To calculate the discounted equity value, Morgan

Stanley used calendar year 2018 EPS estimates from the Parent Forecasts. Morgan Stanley also

adjusted the projected Parent earnings per share to reflect the contemplated buyback of Parent

Common Stock, which assumes a 77 million share buyback using new debt and existing cash at a

buyback price of $10.64 per share of Parent Common Stock as of April 1, 2016 (the last full

trading day prior to the meeting of the Board to approve and adopt the Merger Agreement).

Using its professional judgment and experience, Morgan Stanley applied a range of P/E

multiples (based on the range of price to earnings multiples for the comparable companies and

the growth profile of the Company) to these estimates and applied a discount rate of 8.4%, which

rate was selected based on Parent's estimated cost of equity. Morgan Stanley then calculated the

implied value per Share by multiplying the Parent value per Share by the 0.75 exchange ratio and

adding the $6.45 per Share of cash consideration."   However, the 14D-9 fails to disclose the

following with respect to the above-described work performed by Morgan Stanley:

(a)    The manner of calculating the price to earnings multiples and whether the ranges of multiples that were applied to the estimated earnings reflected a high/low, mean to median range;

(b)    The basis and rationale for selecting a discount rate of 8.4%;

122.    The failure to disclose the above information renders the below table showing the Morgan Stanley's *Discounted Equity Value Analysis* false and/or misleading:

| Calendar Year 2018 EPS | P/E Multiple Range | Implied Present Value Per Share ($) |
|---|---|---|
| Parent Low Range Forecasts | | 15.00 – |
| | 10.0x – 12.0x | 16.71 |
| Parent Mid Range Forecasts | | 15.57 – |
| | 10.0x – 12.0x | 17.39 |
| Parent High Range Forecasts | | 17.10 – |
| | 11.0x – 13.0x | 19.04 |

123.    With respect to Morgan Stanley's *Equity Research Analysts' Future Trading Targets,* the 14D-9 (p. 40-41) fails to disclose the following, specifically relied on and/or utilized by Morgan Stanley:

(a)    The basis and rational for discounting the range of price target at 9.7%;

(b)    The basis and manner for calculating the implied exchange ratio assuming an all stock transaction of 1.36x shares per Brocade common stock.

124.    The failure to disclose the above information renders the exchange ratio range of 0.85x – 1.07x shares per share of Brocade common stock in the Equity Research Analysts' Future Trading Targets Analysis (14D-9, p. 41), false and/or misleading.

125.    With respect to Morgan Stanley's *Relative Contribution Analysis,* the 14D-9 (p. 41) fails to disclose the following, specifically relied on and/or utilized by Morgan Stanley:

(a)    The adjustments made for relative cash and debt balances for Ruckus and Brocade.

126.   The failure to disclose the above information renders the exchange ratio ranges below false and/or misleading:

|  | Range of Exchange Ratios |
|---|---|
| 2015 – 2017 Revenue | 0.82x – 1.07x |
| 2015 – 2017 Gross Profit | 0.82x – 1.10x |
| 2015 – 2017 EBITDA | 0.50x – 0.79x |
| 2015 – 2017 Net Income | 0.41x – 0.63x |

127.   The 14D-9 is false or misleading due to the omissions identified above in paragraphs 95 through 126.   Without such undisclosed information, Company stockholders cannot evaluate for themselves whether the financial analyses performed by Morgan Stanley were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, stockholders require this information in order to fully evaluate the extent to which Morgan Stanley's opinions and analyses should factor into their respective decision whether to vote in favor of the Proposed Transaction.

**Defendants Knew or Recklessly Disregarded that the Recommendation Statement Omits Material Information**

128.   The Individual Defendants, and thus Ruckus, knew or disregarded that the 14D-9 contains the materially incomplete and misleading information discussed above.

129.   Specifically, Defendants on information and belief reviewed the contents of the 14D-9 before it was filed with the SEC and certain Defendants attested that a due inquiry concerning the information set forth in the 14D-9 was made, and the remaining Individual Defendants were obligated to review the 14D-9 before it was filed with the SEC in accordance with their fiduciary duties.   Defendants were thus aware that the 14D-9 contains the misleading partial disclosures referenced above.

130.   Accordingly, on information and belief, the Individual Defendants reviewed or

were presented with the material information concerning the Projections and Morgan Stanley's financial analyses which has been omitted from the 14D-9, and thus knew or recklessly disregarded that such information has been omitted.

## COUNT I

### Claim for Violations of Section 14(e) of the Exchange Act
### Against All Defendants

131.   Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

132.   Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

133.   As discussed above, Ruckus filed and delivered the 14D-9 to its stockholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

134.   During the relevant time period, Defendants disseminated the false and misleading 14D-9 above.  Defendants knew or recklessly disregarded that the 14D-9 failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.   The Recommendation Statement was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

136.   In so doing, Defendants made untrue statements of material facts and omitted

material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

137.   The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares or seek appraisal.  In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

138.   Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

139.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

## COUNT II

### Claim for Violations of Section 14(d)(4) of the Exchange Act and
### SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants

140.    Plaintiff repeats and realleges each allegation contained above as if fully set forth

herein.

141.    Defendants have caused the 14D-9 to be issued with the intention of soliciting

shareholder support of the Proposed Transaction.

142.    Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated

thereunder require full and complete disclosure in connection with tender offers.  Specifically,

Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or
> reject a tender offer or request or invitation for tenders shall be made in
> accordance with such rules and regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the protection of investors.

143.    SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the

Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or
> recommendation to holders of a class of securities referred to in section 14(d)(1)
> of the Act with respect to a tender offer for such securities shall include the name
> of the person making such solicitation or recommendation and the information
> required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and
> adequate summary thereof.

144.    In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's

directors to:

> Furnish such additional information, if any, as may be necessary to make the
> required statements, in light of the circumstances under which they are made, not
> materially misleading.

145.    The 14D-9 violates Section 14(d)(4) and Rule 14d-9 because it omits material

facts, including those set forth above, which omissions render the 14D-9 false and/or misleading.

146.    Defendants knowingly or with deliberate recklessness omitted the material

information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

147.    The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Exchange Offer

148.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### Claim for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

149.    Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

150.    The Individual Defendants acted as controlling persons of Ruckus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ruckus, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the 14D-9 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

151.    Each of the Individual Defendants were provided with or had unlimited access to copies of the 14D-9 and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

152.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The 14D-9 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

153.    In addition, as the 14D-9 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The 14D-9 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

154.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

155.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.       Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.       Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Exchange Offer, unless and until the Company discloses the material information identified above which has been omitted from the 14D-9;

C.       Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.       Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

E.       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.       Granting such other and further equitable relief as this Court may deem just and proper.

Dated:  May 10, 2016

**FARUQI & FARUQI, LLP**

By: */s/ James R. Banko*
James R. Banko (#4518)
Derrick B. Farrell (#5747)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel: (302) 482-3182
Email: jbanko@faruqilaw.com
Email: dfarrell@faruqilaw.com

*Attorneys for Plaintiff Robert D. Borrego*

**OF COUNSEL**

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
James M. Wilson, Jr.
685 Third Avenue, 26th Fl.
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: jmonteverde@faruqilaw.com
      jwilson@faruqilaw.com


*Counsel for Plaintiff Robert D. Borrego*